## SAMUEL M. WILLIAMS AND OTHERS v. THE STATE.

The District Court of the county where an "association of individuals" for illegal banking, &c., (Hart. Dig., Art. 88,) keep their office, has jurisdiction to try and determine a suit, in behalf of the state, to recover the penalty prescribed, for a violation of the Act of 1848. Though the action be by *petition*, in form, yet when brought by the Attorney-General, under the provisions of that act, it is, in effect, a criminal proceeding by information.

The president, cashier, and directors of a bank, are an " *association of individuals*," within the meaning of the act to suppress illegal banking, (Hart. Dig., Art. 87,) and it is no objection to the petition, or information, that it does not, in *terms*, allege them to be such " *association*," if it appear that they were associated together as an organized banking company, and acting together as officers, in doing the thing complained of.

The liability of such defendants, is not affected by the non-joinder, as defendants, of *other* members and stockholders, besides themselves, of what is, by them, claimed to be a corporation, of which they are officers; because it is a criminal action. If the action were for a debt, arising upon a joint liability, then the stockholders should have been joined; in which case, however, the proper manner of making the omission to join them available, would have been by plea in abatement, and not in bar.

A grant of corporate franchises by the legislative power, which requires certain acts to be performed, before it is complete, so as to enable the grantees to exercise the powers designed to be conferred, does not become a vested right in them, until the acts required are performed; and the franchise remains in abeyance. While thus in abeyance, an attempted organization under such charter, and the exercise of the powers intended to be conferred by it, in contravention of a penal law, passed after such grant, whereby it was constituted a misdemeanor, to do those things which the charter permitted, will subject the persons thus associated and acting, to the penalties prescribed for a violation of the law.

The Decree No. 308, of the Congress of Coahuila and Texas, in 1835, did not create the corporation entitled the " Commercial and Agricultural Bank;" it granted the *establishment* of the bank, and authorised Samuel M. Williams, as manager of the enterprise, to move forward with, and procure to be adopted, the necessary steps, which were prescribed for starting into existence this corporate body; but at the same time, the state reserved to itself, the right to determine, through a commissioner, when those measures thus to be taken, had been perfected, as prescribed in the decree.

The act of the Congress of the Republic of Texas, in 1836, providing for the appointment of a commissioner for the purpose contemplated in the Decree No. 308, "in order that the parties may exercise and enjoy their privileges

under said act," was not intended to increase the powers of Williams, or confer upon him new rights, not before possessed under the decree, nor to make any change in the decree, so as to alter the relations which he bore towards the establishment of the bank; but merely to put in force the provisions of the decree, "in order that *the parties* may exercise and enjoy their privileges under said act."

The state had power to test the right of a corporation to issue notes as a circulating medium, by such proceedings as those provided in the Act of 1848, " to suppress illegal banking," (Hart. Dig., Art. 87 ;) and if it recognised in any corporation whatever, such a privilege, a direct proceeding by *quo warranto*, or *scire facias*, was not necessary; but such as were thus provided for, and sought to be enforced in this action, were proper to determine whether the privilege had been usurped or not, and if so, to impose a fine upon the offender.

APPEAL from Galveston. Tried below before the Hon. Peter W. Gray.

This suit was brought in March, 1853, to recover certain penalties claimed from the defendants, for issuing certain promissory notes, to circulate as money, in violation of the " Act to suppress illegal banking," passed the 20th of March, 1848. Each of the said notes purported to bear date on the 1st day of January, 1848, and to be in the following form :

" The Commercial and Agricultural Bank will pay one dollar to bearer on demand.

" S. M. WILLIAMS, *President.*

" J. H. McMILLAN, *Cashier."*

The information charged that the said notes were issued on the 18th of February, 1853.

The attorney-general discontinued as to all the counts contained in the information, except the last, which alleged the issuing of one of the said notes ; and claimed therefor the penalty of two thousand dollars.

The defendants demurred to the petition or information, which demurrer was overruled; they also filed a general denial, and five special pleas, to which the plaintiff excepted. The defendants then withdrew their fourth and fifth pleas, and the general denial; and the exceptions to the remaining pleas having been

18

sustained, by the court, and there remaining no answer on the file, they stood in the judgment of the court without defence; whereupon, at the instance of the attorney-general, the court rendered judgment against them for two thousand dollars and costs.

The substance of the pleadings, so far as they need be stated, is contained in the opinion.

*Allen & Hale*, for the appellants.—The appellants, by their first special plea, set up a sufficient bar to the action of the plaintiff in the court below.

The words commencing the first Article of Decree No. 308, viz: "The establishment of a bank in the department of the Brazos is granted, which shall be called the 'Bank of Commerce and Agriculture,'" declare as effectually as any terms, which the legislature could have adopted, the absolute and immediate creation of a body corporate.

The Bank of Commerce and Agriculture, *eo nomine*, and as a person in law, was ushered into existence, by the phraseology thus used. True, it was not at once clothed with all the capacities it might afterwards acquire, under the provisions of the decree, but its artificial being was perfect, both in name and power of sustentation. The "establishment" was not to be granted upon the happening of any contingency, the performance of any condition, or the taking of any preliminary steps. The grant was made *in præsenti*, not *in futuro*.

In Texas, whether as a department of the Mexican Confederacy, an independant republic, or a member of the North American Union, a corporation has always been a creature of statutory law, an artificial person, adapted, by its formation, to discharge the functions, and effect the purposes for which it was designed. If intended as a means to promote the construction of a railway, or a canal, or the erection of a bank, or an insurance office, or a trading-house, it is created and clothed, by its charter, or act of incorporation, with powers and capacities, best calculated, in view of the legislature, to accomplish the specific

object. It is, says COKE, " a body to take in succession, framed (as to that capacity) by policy, and thereupon it is called a body politic." (Co. Litt. 250 a.) Thus, the railway corporations of this state have been constituted, with an adaption to its settled policy, with reference to this branch of internal improvements. They have generally been framed upon a uniform model, originally adopted by the legislature, and to which most of the charters were required to conform. In pursuance of this plan, the act of incorporation first created, by name, the body politic, investing it with the ordinary powers and capacities, incident to corporate existence. By ordinary powers, are meant such as would necessarily appertain to it as incidents, whether specially mentioned in the act, or not, unless expressly inhibited by its terms. (See Angell & Ames on Corp. 83.)

In this class of charters, the body politic is incorporated, and may continue to exist for years, without a single corporator or member ; the power to organize the company residing, meantime, in the commissioners appointed to take the proper steps, by opening its books, procuring subscriptions to its capital stock, and other acts preliminary to its beginning operations. In the erection of both ancient and modern foundations, the usage has obtained of creating the body politic, "by words sufficient in law, but not restrained by any certain legal or prescript form of words," and without naming, in the charter, any particular persons as immediate corporators. The conditions, upon which individuals might become members of the body politic, being described in the act, is enough to prevent its dissolution, until, *in futuro*, the duly qualified persons are admitted. Thus many corporations exist *in nomine* and *de jure*, like our chartered establishments referred to, without present members, but having capacity to exist and to contract like natural persons, until organised or dissolved, (as the case may be,) in due course of law. (Mahoney v. The State Bank of Arkansas, 4 Pike, 620 ; Case of Sutton's Hospital, 10 Co. Rep. 23 ; Angell & Ames, 64.)

In the last case, many instances are cited, where corporate franchises are granted without present corporators ; as where

Henry IV. granted license to one Robert Ramsey, to give twenty marks annually to a certain chaplain, to say masses at the altar of the blessed Mary, in the Church of St. Magnus, in London, "*pro salubri statu,*" of the aforesaid Robert and Joanna his wife, "to have and to hold to the same chaplain and his successors," &c.; "It was resolved, that the grant was good, for all the grants of Chantrys are of such form, viz: *cuidam capellano,* and although there be no such chaplain at the time, is not to the purpose." (10 Co. Rep. 27, 28.)

The authority of this case has never been questioned, nor the points determined by it overruled, either in this country or England, and the charter granted to Mr. Sutton, as well as others referred to in the case, whereby corporations were established, are, so far as words of incorporation are concerned, quite similar, and of like import, to those of the first article of our decree. The object of the founder was to establish a hospital for such poor, aged, needy and maimed military men, captives in war, and others, as should be found fit objects; also, a free school for the maintenance and education of poor children, and to provide for religious instruction, by a grave and learned divine. King James, in order to aid the charitable purpose of Mr. Sutton, granted him a liberal charter, wherein after declaring that he and his heirs were licensed at any time thereafter, to found and erect a hospital, and take other steps in his charitable work, the king proceeded to "give him means by creation of a capable body politic." Lord COKE remarks that a franchise, or power newly created, has present power to exist, although it cannot take effect or begin operations except *in futuro.* (Id. 28.)

It was objected to the charter of Sutton's Hospital, that it purported to make a present incorporation; whereas, no incorporation could be, till Sutton had named a master, and therefore, it was repugnant and void. To this, it was answered by the court, that "this objection doth extend to the overthrowing of a great number of incorporations; for, when a corporation is created by letters patent, by the same letters, power is given them to choose a master, alderman, bailiffs, governors, or the

like; and yet, they are presently incorporated by the same letters patent. It is presently, by the letter patent, a corporation *in abstracto*, but not *in concreto*, till the naming of a master; and a hospital, *in intention*, only, is sufficient to support the name of a corporation." (10 Co. Rep. 31.) It seems conclusive, then, that the words cited from the first article of our decree, viz: " The establishment of a bank, &c., is granted," make a present corporation, as effectually, as if the legislature had used the words, " the incorporation of a bank is granted;" or, any other words clearly expressing its intention. That " establishment," by force of the act, immediately became a corporation *in abstracto* and *de jure*, fully sufficient to support the name of the " Bank of Commerce and Agriculture," given it by the charter, and an adequate foundation for the various powers, sounding *in futuro*, embraced in the same charter. In the creation of this corporation, the legislature seemed as scrupulously to observe all the essential requisites of the common law, to the formation of such institutions, as if that system had prevailed in Mexico. Thus, it is perfect in point of name, place, the description of members who were to compose it, and words of incorporation sufficient in law. The consideration, which induced the legislature to make this enactment, is declared in the ninth article, viz: "for the encouragement of commerce, the arts and industry." By the last clause of the first article, Samuel M. Williams was appointed as the empresario, at his own risk and account, to take the necessary steps to carry the bank into successful operation; and thus the decree, by implication, grants to him the requisite powers for the purpose. The language of the decree shows yet more clearly the intention of the legislature, to create a present body politic, by means of which the empresario would be enabled the more readily, to effect the local establishment, and develop the practical utilities of the bank. For other than a person in law, having capacity to make contracts, could not have subserved the purpose for which this foundation was originally designed. Every subscriber to the capital stock, at once entered into a contract, which the corporation in its own name, like a natural

person, could, if necessary, enforce by suit. (Angell & Ames on Corp. 474.) It cannot be said, that the early subscribers to the stock of the institution did not contract with it, or that their contracts were made with any other person, than the corporation itself. The "*Banco de Commercio y Agricultura,*" as originally constituted, was the party with whom every subscriber contracted, and was, by the effect of its creation, at once capable of enforcing such contract, by suit, according to its terms. It was not provided by its charter, as it was in that of the Kidwelly Canal Company, that its corporate existence should not be complete until after organization. (Id. 475.) By the tenth article, the subscribers were required to secure, with real estate, the value of their shares, or, in other words, execute a conveyance, in mortgage, to the corporation, as security for the payment of their subscriptions. The licenses contained in the charter, whereby the institution was authorised to have directors, to issue its paper to circulate as money, to make loans, receive interest, &c., were limited to take effect *in futuro*, and after certain preliminary steps, prescribed by the act, had been taken. As, for instance, subscriptions for at least 3000 shares were required by Article 3, before the corporation was entitled to have a board of directors ; and even then the bank could not commence operations, until, at least, $100,000 had been deposited in its vault, as required by Article 10. Then, its right to issue paper, as money, accrued; but under the restrictions, that the bills, so issued, should be signed by the president and cashier, and that the capital of the said bank should be liable for the payment of their value.

Among the attributes with which this institution was presently clothed, as a person in law, by virtue of the said decree, are the following, viz: the capacity to make contracts, to sue and be sued upon such contracts, or other cause of action, to hold lands in mortgage, and, *à fortiori*, to purchase such lands in case of foreclosure, to receive, hold and enforce obligations, liens, and other securities in the sale of its stock, and to act as an intelligent and interested party, and as the lawful beneficiary in all

the negotiations and other proceedings, which the empresario was authorised to adopt, in developing its energies. (Rathbone v. Tioga Nav. Co., 2 Watts & Serg. 74.) No faculty essential to its personal existence, was added after the promulgation of the decree, or by it, otherwise than *in præsenti*. Like the child, in its nonage, it was not permitted at once, the unrestrained exercise of all its powers and functions. It did not spring into existence, full-grown and clad in armor, like Minerva. But it was none the less a complete personality, although it happened to be born an *infant*, instead of a *man*.

Until it had, as before suggested, disposed of 3000 shares of its capital stock, by contract of sale, it had to act by officers, other than a board of directors; and it was not allowed to exercise its privileges as a bank of discount, by issuing its own paper as money, until there had been paid into its vault, $100,000. But the capacity to acquire the requisite qualifications for the enjoyment and exercise of such advantages and privileges, was created along with it. In receiving the first subscriptions to its stock, as well as in all subsequent stages of its growth, it lawfully acted, as it of necessity existed, *by its corporate name*. Without this, not a share could have been subscribed, nor a step taken; for it could not have existed and acted without a name, nor otherwise than by its name; and the same original faculty, whereby it was enabled to receive $100,000, as a basis for commencing banking operations, qualified it to enlarge that basis, to the amount of $1,000,000, for the purpose of augmenting those operations, and extending the benefits and facilities connected with them to various portions of the state, by the establishment of branches. (See Art. 2 and 11.)

Inasmuch as the question of duration is not involved in the present controversy, it would be out of place, to dwell upon this point in argument. Were it relevant, however, it would be easy to show, that the term "duration," used in the decree, refers to the continuance of the bank after complete organization.

The "joint resolution for the relief of McKinney and Williams," approved on the 10th of December, 1836, is a clear re-

cognition, on the part of the Texan congress, of the said decree, as an act of incorporation, and the Bank of Agriculture and Commerce, as an existing body politic. This act expressly mentions the said decree, as "the charter" of said bank. It treats the bank as an acknowledged establishment, having a charter; or, as possessing, in other words, "an act of the legislature creating it a corporation." (Bouvier, Law Dict., Charter.) The resolution also recognises the charter as granted to Samuel M. Williams; not to enable him to create a body politic, as has already been shown, but to aid him in taking the necessary steps to put the bank into operation. It provides for the appointment of the commissioner, for all the purposes contemplated by the 10th article of the said decree, viz: that the bank, upon the $100,000 being deposited in its vault, might begin and conduct its business operations, under his inspection, and, as the resolution itself declares, "in order that the parties might exercise and enjoy their privileges under said act."

Now the legislative department, made the recognitions contained in the said joint resolution, in its distinct, law-making capacity. The resolution possesses all the requisites, both in form and substance, of a constitutional statute, or law of the land. Whatever was thus recognised, therefore, was adopted, enacted, and passed as a law. The legislature gave its construction to the provisions of the decree, and by such construction, expressed its *intention*, or, in other words, *enacted* how the decree should be interpreted and understood. That legislative interpretation, constitutes a portion of the law itself, and is as binding as any other part of the statute. When, therefore, we find the congress of the republic thus recognizing the decree, as "the charter of the Bank of Agriculture and Commerce, granted to Samuel M. Williams by the legislature of the state of Coahuila and Texas, in April, 1835," how can it be affirmed, with a shade of reason, that the decree is no such charter,—that the "establishment," or corporation granted by it, under the name of "Banco de Commercio y Agricultura," was never cre-

ated at all, or that it did not exist at the date of the said resolution, or that the said Williams had no interest in it ?

Again, when we find the appointment of the commissioner required, "in order that the parties may exercise and enjoy their privileges under said act," meaning the decree, can the existence of such "parties" be denied, or can it be pretended that no "privileges" ever accrued to any "parties," under the said decree; or, if they did, that such "parties" are not entitled to exercise and enjoy them ?

But not only does it appear from the joint resolution, but also from the record, that such "parties" did, in fact, exist at the date of the resolution, as subscribers to the capital stock of the bank, and persons otherwise interested in the privileges granted by said decree. These are the parties contemplated by the resolution, and their "privileges" were of too important a character to be ignored or denied. They were, as we repeat, contractors with the body corporate, established by the first article of the charter, and entitled to share in the benefits of the bank, when organized according to its provisions. And as the bank could not go into operation except under the inspection of the commissioner, it was clearly one object of the legislature to remove this disability and secure its organization, so far as the appointment of that officer could avail.

Again, the object and intention of the legislature to facilitate, and even hasten, the erection of this bank, not only for the purposes aforesaid, but to enable the government to effect a loan for the payment of the claims of Messrs. McKinney & Williams, (thereby urging the latter to more strenuous effort,) is plainly deducible from the provisions of the act. Respectfully applying the language of the court, in the case of Brooks v. Hicks, 20 Texas Rep. 667, we say, that "when the object and intention of the statute is plainly deducible from its provisions, they are as obligatory as the letter of the statute itself, and will even prevail over the strict letter."

The decree and resolution being *in pari materia*, are to be regarded as one law—as the charter granted to Samuel M. Wil-

liams, (like that of the Hospital to Sutton,)—to enable him, by means of the body politic thereby created, to develop and render available the operations of the contemplated bank, the establishment of which was then, as now, alike favored and needed.

We have thus far considered the decree, No. 308, as creating or establishing a corporation, *in præsenti*, with capacity of development and organisation. In this point of view, Samuel M. Williams would be the person entrusted with the power to give it activity, and would have an interest in the exercise of this power. But another and more limited view may possibly be taken of this decree; and, without any doubt, upon our own part, as to the correctness of our previous positions, we desire to present the result of a critical examination of the decree, taken in its feeblest sense, or, as the algebraists say, reduced to its lowest expression.

The first article of the decree, after establishing, or founding, a bank of discount, (*banco de avio*,) to be called the Commercial and Agricultural Bank, proceeds to appoint Samuel M. Williams as the empresario, to take the proper measures for its organization, (*plantaçion*.) Banks of this kind were not unknown to the Spanish and Mexican law. The national bank of San Carlos, was created by Charles III., by his *cedula* of June 2d, 1782, which, in its enacting part, contains the following words, "he venido en crear, erigir y autorizar un banco,"—"I have come to create, erect, and authorise a bank." This institution was dissolved in 1829; and the Spanish bank of San Fernando took its place, and has since continued to·exist. The bank of Ferdinand VII. was established in Havana, in 1832, but fell into decay, and was succeeded by other houses of the same character. On the 16th of October, 1830, a bank of discount (*banco de avio*) was established by a decree of.the congress of Mexico, and was afterwards sanctioned and encouraged by many legislative provision. (Galvan. Coll. de Dec. vol. 5, p. 129; Id. vol. 6, p. 102; Id. vol. 7, p. 353; Id. vol. 8, pp. 5, 14.) These institutions were national in their character, and derived their capital, mainly from the government; but the bank, created by the congress of Coahuila and Texas, was evidently

designed to be a private concern, and was to draw its resources from individual means. After its establishment, the government had no interest in its action, and retained no control over it. The commissioner, indeed, was to make an annual examination of its business, but with no power of interference in its management. As a general benefit to the community, like the navigation of the Rio Grande by steam, or the erection of cotton factories at Saltillo, it must always have been an object of interest to the legislature; but every provision in the decree denotes the intention to make it a private and Texan institution. With this view, Samuel M. Williams, a Texan, was appointed empresario. In that capacity, he was to organize the bank; to obtain subscriptions; convene a meeting of the stockholders, and preside at the election of directors. He had thus the power virtually to control the bank; he could select the holders of stock, or distribute it all to himself, and his friends; and he could defer, or hasten, the organization and action of the new corporation, as his views and interests might dictate. This general power is implied, not only by the functions expressly delegated to him, but also by the received meaning of the term which designated his office. The word "empresario," according to the most recent and accurate dictionary of the Spanish language, means, "the private person, who, by a *contract* made with another, or with the government, performs, *at his own account and risk*, the object of that contract;" or, "the person who carries out and manages a mercantile enterprise, or takes part in it, contributing his means to sustain it, *receiving its profits, and suffering its losses*." (Nuevo Diccionario, por una sociedad de literatos, Paris, 1853.) In this sense, the term is used throughout the laws of Coahuila and Texas. The empresarios of the new colonies made contracts (*contratas*) with the government for their empresas; Bradbury and Staples, as empresarios, had the exclusive privilege of navigating the Rio Grande by steam; (Dec. No. 49;) Madero, as empresario, had a similar privilege upon the Trinity; (Dec. No. 218;) tanks were to be made, at the account and risk of private empresarios, on the road from Monclova to

Chihuahua; (Dec. N. 230;) and Carbajal had the exclusive copyright, as empresario, in the publication of the laws of the state; (Dec. No. 319.) In all these laws, the word "empresario" is used as equivalent to "agraciado," and is applied to private contractors or grantees. A privilege—a monopoly—an exclusive right is always conferred upon an empresario; and in the private enterprise, of which he is the manager, the profits and losses are to fall upon him and his associates.

It cannot be doubted, then, that it was the intention of the congress of Coahuila and Texas to grant to Samuel M. Williams—and, no doubt, for a sufficient consideration—the privilege of organizing a banking company in the department of the Brazos. This privilege was, in itself, a valuable right, conferred not only for the sake of public utility, but with a view of benefiting the empresario, and the individual stockholders. In this point of view, it was regarded by the congress of the succeeding republic, when the joint resolution of 1836, called the decree, "the charter granted to Samuel M. Williams," and referred to the "privileges" vested in the parties under it. And when accepted by the grantee, as the pleas of the present appellants expressly allege, the decree thus conferred on Williams, a personal interest in the formation of the bank, which, under the constitutional law of Mexico and Texas, was sacred and inviolable.

The record discloses no ground for alleging non-acceptance, or neglect to use the privileges conferred by the charter. The second plea of the appellants, contains a full history of the steps taken by the empresario, in pursuance of the charter, in order to carry the bank into operation. It avers the acceptance of the decree by him, and that he immediately proceeded to procure subscriptions to the capital stock of the bank, caused blank notes to be engraved for its future use, and interested other persons with himself in the privileges granted by the decree. All these steps were taken before the revolution of 1836, the breaking out of which interrupted his proceedings. The government and people of Texas, by the adoption of the joint resolution, and the appointment of the commissioner, by the executive, encouraged

and invited him to a renewal of his exertions. The plea shows, that he thereupon renewed and continued his efforts, by procuring other and further subscriptions to the capital stock of the bank, by assigning a portion of his own interest, for a valuable consideration, to one Henry H. Williams, and by using other means to obtain the hundred thousand dollars. The causes, which conspired to delay the attainment of his object and embarrass his progress, are stated in detail; but never did he remit or forego the prosecution of his enterprise, until the three thousand shares of stock were subscribed, and the requisite funds obtained, and deposited in its vault, to justify the bank to commence operations, pursuant to the provisions of its charter. This could not be effected until the 30th of December, 1847; and no delay intervened prior to the organization of the bank, which has ever since continued in successful operation, under its charter.

Every step thus taken by the empresario, was in strict compliance with the requirements of the decree. To obtain the requisite subscriptions, and cause their value or price to be paid and deposited in the vault of the bank, were the principal measures to be accomplished. Procuring engraved blank notes, and the negotiations with Henry H. Williams and others, in order to obtain funds for the establishment, were also appropriate steps, directly tending to the accomplishment of the grand result. How then, in the face of such facts, can it be held, that the charter was not accepted, or its use neglected? The franchises, privileges, and licenses, granted by it, (excepting only the carrying on of banking operations,) have been in uninterrupted use, from the passage of the decree down to the present hour, with a brief interval during the revolution of 1836. No formal deed, however, authenticated or solemnized, could so forcibly or effectually have declared the acceptance of the charter, as the series of steps, thus taken in pursuance of it by the empresarios, and persisted in under the most discouraging circumstances, until the object was attained. The idea, or charge of *non-user*, seems to have originated in the supposition that the organization of this bank, and the creation of the body politic, were one and the same

thing. We have shown, we think conclusively, that the local establishment of the bank was only an incident to the corporation, and that the latter, created by the decree, existed for all purposes preliminary to such local establishment, and as a means to effect it, from the promulgation of the decree. The steps taken by the empresario, and others, set forth in the plea, were as much an *user* of the privileges granted by the decree, as the business operations of the bank, could have been.

*Attorney-General,* for the appellee.

ROBERTS, J.—This is a criminal proceeding by information. The act, which requires the attorney-general to institute it on behalf of the state, makes the act, intended to be charged against the defendant, a misdemeanor. (Hart. Dig., Art. 87.) "No person shall be holden to answer for any criminal charge, but on indictment or information." (Bill of Rights, part of sec. 8.) It is instituted in Galveston county, because that is the county in which the association of individuals kept their office. (Hart. Dig., Art. 88.) The information does not allege that fact in the language of the statute, but the same idea is conveyed by alleging that the defendants, in the county of Galveston, were associated together, being the president, cashier, and directors of an illegal bank, "the said illegal bank having and keeping an office in the city of Galveston, in the said county of Galveston." This expression is as certain, as if it had been literally accurate. For if they are the officers of the bank, which has an office in Galveston, it is their office necessarily.

They are charged as an "association of individuals." Again, the pleader has departed from the words of the statute, without varying from their meaning. The statute provides, "that any corporation, company, or association of individuals, who shall use or exercise banking or discounting privileges in this state, or who shall issue any bill, check, promissory note or other paper, in this state, to circulate as money, without authority of law, shall be deemed guilty of a misdemeanor, and shall be liable to

a fine of not less than two thousand, nor more than five thousand dollars ; which may be recovered by a suit in the District Court, in the name of the state." (Hart. Dig., Art. 87.)

It is alleged, that the defendants, (setting out their names,) " were then and there, and previously thereto, had been, associated together, being the said Samuel M. Williams, president, and a director, the said Henry Jenkins, cashier, and the other defendants, the other directors, of a certain illegal bank, called ' The Commercial and Agricultural Bank,' the said illegal bank, then and there, having and keeping, and previously thereto, had and kept, an office in the city of Galveston, in the said county of Galveston, and in the said state; and that on the said 18th day of February, 1853, in the county of Galveston aforesaid, the said defendants, in the characters and capacities of president, directors, and cashier, as aforesaid, did, then and there, without authority of law, issue in this state, to circulate as money, a certain lithographed, or engraved and written promissory note," &c.

The facts, here alleged in connexion, show that they were associated together, as an organized banking company, and acting together as officers, in doing the thing complained of. If they were thus associated with a common interest, purpose, and action, they were surely an " association of individuals."

It is contended by the defendants, that they, being the officers of a bank, and only a part of the stockholders, do not constitute *the association* of *individuals,* contemplated by the statute. This question is raised by a plea, in which it is alleged, that they were president, directors, and cashier of an association, claiming to be a corporation, under the name of the Commercial and Agricultural Bank, and composed of a large number of members and stockholders beside themselves; and that they were not an *association,* or *associated together,* otherwise than by holding said offices, and by being such members. By this it is assumed, that all the stockholders constituted the association, and that they should all have been prosecuted, in order to reach the association of individuals. The statute evidently contemplates, that the persons prosecuted shall be an organized association of

individuals, having officers, who may be served with process, and upon whose property execution may be levied, in default of the estate which may belong to the association. (Hart. Dig., Art. 88.) It would seem, that as this common estate is owned by all the stockholders, and is the fund primarily resorted to in satisfaction of the penalty imposed, it would be most appropriate to join them all as defendants, as constituting the association, if the subject be considered alone in reference to the property, which may thus be subjected to the payment of the fine. If this were a debt, arising upon a joint liability, then the stock-holders would constitute the association, in respect to that liability, and should all be joined. If a portion of them were left out, their remedy would not be to plead in bar generally, that there were a number of other stockholders not sued, as the plea states in this case, but by plea in abatement, showing who else should be joined. (1 Chitty, Pl. 46, 47.) Where the liability arises out of a tort jointly committed, all need not be joined. There may be exceptions to this rule, when in some cases the default is by persons having a joint interest in the subject-matter, imposing a joint duty, and then the non-joinder must be pleaded in abatement. (Gould's Pl. 207, 208.) In criminal cases, any one, a part, or all of those jointly concerned in committing an offence, may be prosecuted. (1 Chitty, Crim. Law, 267, 268, 269.)

The expression, "any association of individuals," as used in the statute, must be considered also in reference to the prohibited act, to wit: the issuing of a promissory note, in this state, to circulate as money, without lawful authority. The act, which inflicts the injury, must be done in this state. Some of the stockholders may have lived in Europe, and may never have been in Texas. Some of them may have opposed and protested against the act of issuing, as an unauthorised act of the directors. Even nine-tenths of them may have done so. If the mere allegation and proof, that there were other stockholders not sued, would defeat the prosecution, who should the state prosecute? Upon the supposition, which alone would justify a prosecution

in this case, the association was unauthorised; and if so, it was not subject to any visitation by any one, who could give information, as to who were stockholders. And if it be important to join all the stockholders, so as to make the judgment subject *their* property to the satisfaction of the penalty imposed, then it would follow, that new parties must be made during the prosecution, just as the stock may be transferred from one person, who is sued, to another, who is not. Infants, married women, lunatics, trustees, administrators, executors, guardians, and corporations, whether abroad or at home, may own or control portions of this stock.

These considerations serve to indicate, that who may own the capital invested, and what are the terms of association, as a private financial adventure, are of no sort of consequence. The important matter is, what individuals are associated together in doing the prohibited act. They constitute the association of individuals contemplated. If they are but agents, without interest in the capital, otherwise than to control and manage it, and by their associated and organized action, become the instruments by which this criminal act is perpetrated, they cannot shelter themselves under their agency. They may be agents as to the capital which they manage, but they are principals as to the offence, by acting in organized concert, in doing that which the law forbids. The statute uses the words, *any association* of *individuals*, in designating the persons to be prosecuted. It is not the object of the law, to enable the state to realize a large amount of money by forfeiture of capital vested in illegal banking within the state. Its object is, to prevent any persons from associating together, whether as agents for others, or as principals, in the management of capital, or in any capacity whatever, for the purpose of issuing notes to circulate as money. The forfeiture of the capital, or a portion of it, which they control for themselves, or are permitted by others to control, in this illegal business, is merely incidental,—a means adopted to deter persons from forming such an association, for such a purpose. In default of the estate of the association, the property of the officers must be taken in

execution. An officer may have no sort of interest in the capital stock, or the profits of it; and may constitute no part of the association of stockholders, who own the capital. Why then does the law render him liable to this prosecution, and subject his property to the payment of the penalty? Simply because his want of interest, and not being a stockholder, are not the only tests of his criminality. Being an officer, and in that capacity participating in the prohibited act, makes him a member of the association. Stockholders may be liable to prosecution. They are linked to the association by their capital, through the use they permit to be made of it. But officers are linked to it by their participation in the illegal act. Corporations even may be formed, wherein those who are the beneficiaries, the parties interested, are not a part of the association who control the business.

The plea admits both the interest as stockholders, and the participation in the prohibited act as officers, on the part of the defendants, and that they are associated as officers for the performance of that very thing. The fact that other persons, who are not joined with them, may also be liable to be prosecuted as a part of the association, is no defence.

The next question is, was this note issued, as it is alleged to be, "without authority of law?" The defence set up to establish their lawful authority is, that Decree No. 308, of 1835, of the congress of Coahuila and Texas, created at the time of its passage, a body corporate, and vested in Samuel M. Williams, an interest in it, which no subsequent legislation has divested. And that the association, in 1847, having been properly organized, under the charter then granted to him, these defendants being officers thereof, had lawful authority to issue said note to circulate as money, according to the terms of the said charter. The leading subject of inquiry is the character of interest vested in Samuel M. Williams by this decree.

It is matter of history, that Samuel M. Williams was intimately connected with the foundation, growth, and prosperity of Austin's colony. In 1835, its population and resources had

so increased, as to induce some of the colonists to desire greater monetary facilities, in their isolated situation, than could be enjoyed by the use of gold and silver, and foreign bank bills. To provide for this want, whether real or not, Samuel M. Williams, as we may presume, applied to the state government, for the establishment of a bank, in the department of Brazos. In response to this application, this decree was made, in which the establishment of a bank is permitted, granted, or conceded.

The first article says, as it is translated in the laws and decrees of Coahuila and Texas : " It is hereby granted, that a bank be established in the department of Brazos, to be called ' Commercial and Agricultural Bank.' Samuel M. Williams, as empresario, shall take the proper measures for the establishment thereof." ("Se concede el establecimiento de un banco de avio en el departamento de los Brazos, que se denominará Banco de Comercio y Agricultura. El cindadans Samuel M. Williams promoverá como empresario lo conveniente para su plantacion.")

The portions of said decree, which it is necessary to recite, to ascertain what measures were necessary to be taken, in order to establish the bank, are as follows :

" Art. 3. The subscribers having joined for three thousand shares, at least, (shares were one hundred dollars each,) the empresario shall call a meeting of the same, and proceed to elect eight directors, who shall choose a president among themselves, and they shall perform the duties of their office one year.

" Art. 7. The board of directors shall form internal regulations for the financial management for all the business of the association.

" Art. 10. The subscribers shall adequately secure the value of their shares with real estate in the republic ; and as soon as one hundred thousand dollars, at least, have entered the vault of the bank, it may commence operations ; a commissioner to be appointed by the executive, (gobierno,) previously intervening, who shall furthermore examine, every year, the state of the concerns of the association."

In devising the means of settling the country, the state had

been familiar with the use of empresarios and commissioners; and their duties and powers in their colonial system, were well known. It was quite natural that it should adopt the same instrumentality, in developing the resources of one of its established colonies; and hence, the decree is so meagre, in defining the duties and powers in this enterprise. The empresario did not, by his contract, acquire a right to the land within the limits of his colony. His right depended upon his introducing settlers after making the contract; and whatever preparation he might make, or expense he might be at, if he failed to comply with the terms of his contract, his right failed; and if his services had been beneficial to the country, his only remedy was to apply to the government for relief, as was done in the case of Power and Hewitson. (See Laws of Coahuila and Texas, Decree.) The commissioner of a colony was an officer of the government, appointed to investigate the acts of the empresario, in the performance of his contract, and to grant titles to those who might be shown to be entitled to them under the law of colonization. This view will throw light upon the provisions of this decree.

There are no express terms of incorporation used. But from the organization devised, it is evident, that a corporation aggregate was intended to be established; with subscribers of stock, who should elect a board of directory to manage the institution. This was the object ultimately to be attained, in relation to the character of the body corporate, intended to be created. This was the personal organization of the establishment, conceded for the benefit of the department of Brazos. Samuel M. Williams was deemed a proper person to undertake this enterprise, and take the proper steps for the erection, or laying the foundation of (para su plantaçion,) this establishment. His duties obviously were, to look out for and select persons, who would unite as subscribers for shares in the bank, and when three thousand shares were taken, it was his duty to call a meeting of the subscribers, to elect a board of eight directors, who should, among themselves, select a president. The financial management of the business of the association was then vested in this board of direc-

tors.   Suppose, at this initiatory step towards a complete organization, Williams had been unable or unwilling to unite with the subscribers, and had not taken any share; he could have had no interest in the institution; nor would he have been a member of the association.   For without one share he could not have been a subscriber, entitled annually to vote for directors; and without being an "owner of five shares, at least," he could not have had the prescribed qualification for a director.   After the directory should have been elected, and the value of the shares secured with real estate, in the republic, and one hundred thousand dollars entered the vault of the bank, it would then have been necessary for a commissioner to have visited the institution, and inspected and approved of these acts, as having been done in accordance with the charter.   Upon this being done, and not until then, would the association have been organized completely, so as to commence operations.   Had Williams taken all the stock, and furnished the requisite security, and money, and exhibited them to the commissioner, assuming to be sole subscriber and director, the commissioner could hardly have decided that such an arrangement met the policy of the law, which prescribed eight directors to manage this institution.   The object of the government in its establishment, was the benefit to the public, as well as an advantage to the subscribers, and the interest of the public might be much better subserved, in affording accommodations to the citizens, by eight directors, than one.   So, if the commissioner was not satisfied, that the shares were secured adequately, so that citizens would be safe in dealing with the institution, or if not satisfied that the proper amount of money had entered the vaults of the bank, it would have been his duty to decline giving his sanction; and the organization would still be incomplete.   The rights of those concerned, if a sufficient number had united, would be imperfect.   If the government should never appoint a commissioner to pass upon these measures, then the association could not be organized, and the initiatory steps, which may have been taken by the empresario and others uniting with, or through him, would fall to the ground.   As in

case of a colony, if no commissioner, or other person in that capacity, be appointed to pass upon the rights of colonists and empresarios, and no titles be granted, the empresario could have acquired no vested right to any land in the colony.   His equity, as against the government, for redress for his trouble and expense, may have moved the government into additional action for his relief, but if it should not, he must have been without remedy.

This view of the subject shows, that at the time this decree was passed, the state was not prepared to say what individuals should compose this aggregate corporation, intended to be conceded, and thereby at once create it.   Therefore, it granted the establishment of the bank in the department of Brazos.   And to perfect the grant, it authorised Williams, as manager of the enterprise, to move forward with, and procure to be adopted, the necessary steps, which were prescribed for starting into existence this corporate body; and at the same time, the state reserved to itself the right to determine, through a commissioner, when those measures thus to be taken had been perfected, as prescribed in the decree: so that the commencement of its existence was made to depend upon the concurrent action of the subscribers, who might unite under the instrumentality of the empresario, and of the government, thereafter to be performed through a commissioner, to be appointed for that purpose. (Laws of Coahuila and Texas, 296.)

BACON says, "Yet the king may give power to a common person, to name the corporation, and the persons it is to consist of; but when he has so done, this corporation does not take its essence from the common person, but from the king." (Cites 10 Co. 33 b.) In the case before us, the state reserved the right to determine, whether or not the persons had qualified themselves by their acts to become corporators, so as to form the association, or body corporate, conceded.   Justice STORY said, " When, on the other hand, the corporation is to be brought into existence by some future acts of the corporators, the franchises remain in abeyance until such acts are done: and when

the corporation is brought into life, the franchises instantaneously attach to it." (Dartmouth College v. Woodward, 4 Wheat. Rep. 690.) Chancellor WALWORTH said, "The act under which the commissioners opened books of subscription to the capital stock of the Utica and Schenectady railroad company, did not create a corporation, *eo instanti*, when that act took effect as a law; it only constituted such persons a body corporate, as should thereafter become stockholders, in the manner prescribed in the act. As there could be neither a corporation nor stockholders in existence until after the stock was apportioned, the commissioners did not hold the stock, nor did they act in the character of officers, servants, agents, or trustees of the corporation, or of the subscribers. But they acted merely as officers, or agents of the government, appointed by the legislature, to assist in the organization of a corporation, and to create a stock in the same." (Walker v. Devereaux, 4 Paige, Ch. 245.)

In the case last cited, the persons called commissioners, combined the duties of both empresario and commissioner, as contemplated in the decree, No. 308. The reasoning above quoted, will apply to this case, if it be considered that the decree indicated that the subscribers for shares were to be the corporators, as plainly as though it had been expressed.

Had the intention existed of creating a corporation, *eo instanti*, and of making Williams the sole corporator, until he chose to unite others with him, the grant would have been made directly to him, or to him and his associates. (Angell & Ames on Corp. 24, § 28.) It is said, in Pennsylvania, in accordance with the general authority in relation to corporate privileges, "no privilege is granted unless it be expressed in plain and unequivocal words, testifying the intention of the legislature, in a manner too plain to be misunderstood." (Sedgwick on Stat. and Con. Law, 342.)

We have instances of the direct grant of exclusive privileges in the decrees of Coahuila and Texas, which may serve to illustrate the mode of expression adopted in such cases. After accepting formally the proposition of Benjamin H. Milam, to

clear out the Colorado river, the second article of Decree No.
302, says: "In pursuance thereof, exclusive right is hereby
granted to said Milam, for the term of ten years, for navigat-
ing the said river," &c. (Laws of Coahuila and Texas, 292.)
Again, in Decree No. 271, it is said: "Art 1. Exclusive pri-
vilege is hereby granted to James Grant, for the term of ten
years, for manufacturing with machinery every kind of cotton
and woolen goods," &c. (See also No. 160.)

This authority granted to Williams, of taking the steps to
establish a bank, was confirmed and continued by an act of the
legislature of Texas, in 1836, in the following words: "That
the president be, and he is hereby authorised and required to
appoint a commissioner, for the purpose contemplated in the
tenth article of the charter of the Bank of Agriculture and Com-
merce, granted to Samuel M. Williams, by the legislature of the
state of Coahuila and Texas, in April, 1835, in order that the
parties may exercise and enjoy their privileges under said act."
It was doubtless well known to many members of that legislature,
that Samuel M. Williams had been mainly instrumental in ob-
taining the charter, and being named in it, as the person autho-
rized to take the necessary steps for its establishment, it might
very well be said, that it was granted to him by a mere recital
in an act, (whose object was the appointment of a commissioner,)
without intending to increase his powers, or confer upon him new
rights, not before possessed under the decree. The shape and
object of the section quoted shows, without question, that the
legislative attention was not addressed to the powers or rights
of Williams in the charter, but to provide the means necessary
to enable him to give effect to them, by the appointment of a
commissioner. It takes for granted that his powers were still
in force. These considerations render it sufficiently obvious,
that it was no part of the intention of the legislature to make
any change in the decree, so as to alter the relations, which
Williams bore towards the establishment of the bank, but to put
in force the provisions of the decree, "in order that *the parties*

may exercise and enjoy their privileges under said act." (Referring to the decree, and styling it an act.)

Without discussing the point, as to whether or not the repealing clause of the Act adopting the common law, in 1840, repeals this decree, No. 308, we may advance at once to the enactments, immediately connected with the subject. An Act of 1844, passed three years before this association claims to have been organized for business, provides, "that all laws, granting to any individual, individuals, or corporations, the authority to issue either bills or promissory notes, to pass and circulate as money, are hereby repealed; and the authority to issue either bills or promissory notes, or any other instrument in writing, in print, hieroglyphics, or engraving, to circulate as money, is hereby abrogated." (Hart. Dig., Art. 83.) This is too plain and pointed, to admit of comment. If Williams, or others, had not, up to that time, acquired a vested right as corporators, this privilege of issuing notes was abrogated, whatever other powers it left, in force, to be exercised under the charter.

The constitution of the state makes provision, that "the rights of property and of action which have been acquired under the constitution and laws of the republic of Texas, shall not be divested," &c. And further, that " no corporate body shall hereafter be created, renewed or extended, with banking or discounting privileges;" and further, "the legislature shall prohibit, by law, individuals from issuing bills, checks, promissory notes, or other paper, to circulate as money." And further, that "the offices of president, &c., and others repugnant to this constitution, shall be superseded by the same," &c. (Hart. Dig., Art. 73, 74, 82.) These provisions show, that the policy of the state had changed gradually from 1836 to 1845, and that the state could, thereafter, not be instrumental in, or give its consent to, the creation, extension, or renewal of any banking corporation. And it would have been repugnant to this policy, so fully developed, to tolerate the continuance of the office of commissioner, whose only duty was to do that which would

start into existence exactly such a corporation, and to visit it from year to year.

In relation to the measures taken by Williams for the establishment of the bank, the plea states, that he accepted the charter; that he procured subscriptions to the capital stock; expended means in engraving the blank notes for future use of said bank; that, in 1837, he sold, for a valuable consideration, a portion of his interest to Henry H. Williams; that Niles F. Smith, in 1836, or some time soon thereafter, was appointed commissioner, which office he accepted, and that he has ever since discharged its functions; that the revolution, and embarrassments of the money market, delayed the completion of the measures necessary for its establishment; that in December, 1847, the subscribers, including said Henry H. Williams and others, who had previously subscribed, having joined for more than three thousand shares thereof, and the money having been counted by the commissioner, as appears by his certificate; that a meeting of the subscribers having been called by the empresario, was held, and directors were elected, and that the bank then went into operation.

It is to be observed, that it is not shown that the value of the shares were secured by real estate in the republic or state; that the commissioner did anything except count the money, and certify to that fact; that at any time, before 1847, was there as much as three thousand shares subscribed, or a meeting of the subscribers called. If there were not three thousand shares subscribed, the whole matter was in abeyance, and no right was acquired by a subscriber. If there was no meeting of the subscribers, and election of directors, there was no organization of the association. Williams, then, could have acquired no vested right, as a subscriber, or director, up to 1847. His sale to Henry H. Williams, in 1837, of a portion of his own interest therein, could convey no greater interest than he then had, which was just what the decree itself conferred; which, as we have seen, was simply the power or authority granted to him by the state, to set in motion and superintend the necessary

measures, as prescribed for the establishment of the bank, subject to the future sanction of the government, through its commissioner, so as to give the aggregate corporation, contemplated in the decree, a recognised commencement and existence.

This association, as a corporate body, was put in existence, if at all, in 1847; after the repealing law of 1844, and after the prohibition of the state constitution.

The authority of Samuel M. Williams, was not, then, that sort of vested right or privilege, as that the sovereign powers of the republic and state could not cut it off, by repealing or abrogating the decree conferring the authority; and therefore defendants had not authority by law to issue such note.

Upon another ground assumed in defence,—that this association having assumed to act as a corporation in doing this act, its corporate powers can only be called in question by a direct proceeding of *quo warranto*, or of *scire facias*,—it may be answered, that if the state recognised in any corporation whatever, such a privilege, as issuing notes to circulate as money, it would have a right to prescribe, that that matter should be tested, by just such proceedings as those provided in the Act of 1848, under which this suit was instituted; and, upon finding the privilege to have been usurped, to impose a fine for it. This proceeding is not intended to call in question their power to act as a corporation, except on this subject. It seeks to establish, that this power or privilege, considering the time of its organization, was never vested in this association. The same argument would shelter any railroad corporation, that might usurp this privilege. The authorities cited in support of this defence, refer to a different state of case, as may be readily shown by an examination of the cases, and the principles upon which they rest.

These are believed to be the main questions involved in the case, which require an exposition. We do not think that the court below erred in its judgment.

The code contains a saving clause, which prevents this prosecution from being defeated, notwithstanding there may have

been a repeal, by necessary implication, of the law of 1848. (Code Crim. Proc., Art. 187.) This offence, committed by an association of individuals, has not been continued in existence, therefore, it cannot be said that the punishment has been ameliorated. The same evil is sought to be reached by a different definition of an offence, in which the idea of association, as an element thereof, does not enter. (Penal Code, Art. 17, 400, 401, 402.) Judgment is affirmed.

Judgment affirmed.